So Ordered.

Signed this 27 day of April, 2026.



_____

Wendy A. Kinsella
United States Bankruptcy Judge

# THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Vanderbilt Minerals, LLC, | Case No. 26-60110 (WAK) |
| Debtor. | |

## MEMORANDUM DECISION ON
## MOTION TO APPROVE GLOBAL SETTLEMENT

Before the Court is the Settlement Motion[1] filed by Vanderbilt Minerals, LLC (the

"Debtor") at the sole direction of its Independent Manager and the Sole Member of the

---

[1] *Motion of the Debtor at the Sole Direction of Independent Manager and Sole Member of the Independent Special Committee of the Debtor for Entry of an Order (I) Approving the Global Settlement Between the Debtor and R.T. Vanderbilt Holding Co., Inc. and Certain of its Subsidiaries; and (II) Granting Related Relief* (the "Motion" at Doc. 22). The Motion is supported by the following: (i) *Declaration of Ben Pickering, in his Capacity as Independent Manager and Sole Member of the Independent Special Committee, in Support of the Global Settlement Motion* (the "Pickering Declaration" at Doc. 23); (ii) *Commodore's Reply to United States Trustee and Creditors Committee Objections to Global Settlement* (the "Commodore Reply" at Doc. 358); (iii) *Reply of the Debtor at the Sole Direction of Independent Manager and Sole Member of the Independent Special Committee in Support of Motion for Entry of an Order (I) Approving the Global Settlement Between the Debtor and R.T. Vanderbilt Holding Co., Inc. and Certain of its Subsidiaries; and (II) Granting Related Relief* (the "Debtor Reply" at Doc. 359); and (iv) *R.T. Vanderbilt's Response in Support of Motion for Entry of Order Approving the Global Settlement Between Debtor and R.T. Vanderbilt Holding Co., Inc. and Certain of its Subsidiaries* (the "Holdings Reply" at Doc. 363).

1

Independent Special Committee, Ben Pickering ("Mr. Pickering").[2]  The United States Trustee (the "UST") and the Official Committee of Unsecured Creditors (the "UCC") each filed objections to the Motion.[3]

The Motion seeks approval of a global settlement (the "Global Settlement") between the Debtor and its affiliates, R.T. Vanderbilt Holding Company, Inc. ("Holdings"), Vanderbilt Chemicals, LLC ("Chemicals"), Vanderbilt Global Services, LLC ("Global Services"), Vanderbilt Worldwide, LLC ("Worldwide"), and Advanced Milling Technologies, LLC ("AMT," and collectively with Holdings, Chemicals, Global Services, and Worldwide, "RTV").  The Global Settlement resolves intercompany claims due to the Debtor in exchange for the transfer of certain Settlement Assets[4] to the Debtor to be included in a pending section 363 sale of the Debtor's business as a going concern.  The primary disputes are: (a) whether the Global Settlement, as an insider transaction, meets the heightened standard for approval under Rule 9019 and the *Iridium* factors; and (b) whether the Debtor's broad release of claims against RTV is permissible and appropriate.

---

[2] For purposes of this Memorandum Decision, the Court will refer to the Debtor but any arguments in support of the Motion were made by, or on behalf of, Mr. Pickering in his capacity as its Independent Manager and the Sole Member of the Independent Special Committee, unless noted otherwise.

[3] *United States Trustee's Objection to the Debtor's Motion for Entry of an Order Approving the Global Settlement Between the Debtor and R.T. Vanderbilt Holding Co., Inc. and Certain Subsidiaries; and Granting Related Relief* (the "UST Objection" at Doc. 306) and the *Objection of the Official Committee of Unsecured Creditors to Motion of the Debtor at the Sole Direction of Independent Manager and Sole Member of the Independent Special Committee of the Debtor for Entry of an Order (I) Approving the Global Settlement Between the Debtor and R.T. Vanderbilt Holding Co., Inc. and Certain of its Subsidiaries; and (II) Granting Related Relief* (the "UCC Objection" at Doc. 309; together with the UST Objection are the "Objections"). The UCC Objection is supported by the following: (i) *Declaration of Eric R. Goodman in Support of the Objection of the Official Committee of Unsecured Creditors to Motion of the Debtor at the Sole Direction of Independent Manager and Sole Member of the Independent Special Committee of the Debtor for Entry of an Order (I) Approving the Global Settlement Between the Debtor and R.T. Vanderbilt Holding Co., Inc. and Certain of Its Subsidiaries; and (II) Granting Related Relief* (the "Goodman Declaration" at Doc. 310); (ii) *Amended Declaration of Eric R. Goodman in Support of the Objection of the Official Committee of Unsecured Creditors to Motion of the Debtor at the Sole Direction of Independent Manager and Sole Member of the Independent Special Committee of the Debtor for Entry of an Order (I) Approving the Global Settlement Between the Debtor and R.T. Vanderbilt Holding Co., Inc. and Certain of its Subsidiaries; and (II) Granting Related Relief* (the "Amended Goodman Declaration" at Doc. 323).

[4] The Settlement Assets are listed as: (i) the VEEGUM® Plant in Murray, KY; (ii) the Lyles mine in Arizona; (iii) the Netzsch Mill; and (iv) other equipment utilized in the Debtor's day-to-day operations.

A hearing (the "Hearing")[5] was held on April 16-17, 2026.[6] After testimony and argument concluded, the Court adjourned for an oral ruling on April 22, 2026, at which time it granted the Motion. The Court issues this Memorandum Decision to memorialize its findings.

## I.    Jurisdiction

The Court has jurisdiction to hear and decide this case pursuant to 28 U.S.C. §§ 1334, and 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## II.    Background

The Court assumes the parties' familiarity with the general background of the bankruptcy case and will only set out the facts necessary for a resolution of the Motion and the Objections.

In 2012-2013, the Debtor's predecessor, R.T. Vanderbilt Company Inc., engaged in restructuring transactions wherein it separated the chemicals and mining businesses and created, *inter alia*, the Debtor (the "2013 Restructuring"). Holdings was established as the parent company, the Debtor and Chemicals became the operating entities, and the other affiliates were formed to provide certain administrative and support services pursuant to several intercompany service

---

[5] The following documents were admitted into evidence at the Hearing: (i) Special Committee Exhibit 1 ("Settlement and Release Agreement"); (ii) Special Committee Exhibit 2 ("December 15, 2025 Presentation"); (iii) Special Committee Exhibit 3 ("January 27, 2026 Presentation"); (iv) Special Committee Exhibit 4 ("February 13, 2026 Presentation"); (v) Special Committee Exhibit 8 (the "Timeline"); (vi) UCC Exhibit 39 ("November 9, 2025 email from Vomero to Pickering et al."); (vii) UCC Exhibit 49 ("December 15, 2025 Presentation – Redacted"); (viii) UCC Exhibit 250 ("December 15, 2025 Presentation – Unredacted"); (ix) UCC Exhibit 55 ("Second Amended Promissory Note"); (x) UCC Exhibit 150 ("Declaration of Michael Atkinson"); (xi) UCC Exhibit 242 ("January 21, 2026 email from Pickering to McKee"); (xii) UCC Exhibit 243 ("January 15, 2026 email from Giglio to Pickering"); (xiii) Holdings Exhibit 2 ("Declaration of Michael Weiss"); (xiv) Holdings Exhibit 3 ("Cash flow 2023–2024"); (xv) Holdings Exhibit 4 ("SAP Entries v. Economic Reality Flow Chart"); (xvi) Holdings Exhibit 5 ("Five-year Projections – 2025–2030"); (xvii) Holdings Exhibit 6 ("Declaration of Michael Wyse April 8, 2026"); (xviii) Holdings Exhibit 7 ("March 1, 2024 Amended and Restated Credit and Security Agreement"); (xix) Holdings Exhibit 8 ("Subordination Agreement – July 27, 2016"); (xx) Holdings Exhibit 9 ("Union Contract between Chemicals and Steel Union").

[6] *Transcript of Motion to Settle filed by Vanderbilt Minerals, LLC* (Doc. No. 22), *Motion to Seal Document Filed by Official Committee of Unsecured Creditors* (Doc. No. 311) *dated April 16, 2026* (the "April 16 Transcript" at Doc. 466) and *Transcript of Motion to Settle filed by Vanderbilt Minerals, LLC* (Doc. No. 22), *dated April 17, 2026* (the "April 17 Transcript" at Doc. 467).

agreements ("Intercompany Agreements").   Since that time, the Debtor has operated certain mining and related businesses that is comprised of a complex set of assets that includes substantially all assets owned by the Debtor and certain assets owned by RTV – specifically the VEEGUM® Plant in Murray, KY (which is part of a larger chemical processing facility critical to Chemicals' business), the Lyles mine in Arizona, and the Netzsch Mill and other equipment utilized in the Debtor's day-to-day operations, that are the subject of the Settlement Motion. *Motion*, at ¶ 4.

In the years after the 2013 Restructuring, the Debtor continued to face rising costs from talc litigation and settlements, including large adverse verdicts in 2024 and 2025.  It began to explore its options for a strategic restructuring and hired Dean Vomero of Applied Business Strategies ("ABS") as Chief Restructuring Officer.  Based on Mr. Vomero's review of the Debtor's financial condition, including the pending talc litigation, he concluded that restructuring was necessary because the Debtor would not be able to grow and improve its business with the talc litigation and associated defense costs mounting.  Mr. Vomero concluded that a section 363 sale through bankruptcy would maximize the value of the Debtor's assets. *Declaration of Dean Vomero in Support of the Bidding Procedures and DIP Financing Motions*, Doc. 19, at ¶¶ 8–9.  As a result, in August 2025, the Debtor hired Greenhill & Co., LLC to investigate debtor in possession financing opportunities and to market its assets for sale, but "it became clear that in order to achieve a value-maximizing sale the Debtor would need to include the Settlement Assets among those being marketed as part of the Debtor's business." *See Motion*, at ¶ 14; *see also*, *April 16 Transcript*, at 25:2–20.

Around that same time frame, in September, 2025, the Debtor, through its board of managers, appointed Ben Pickering as an independent manager, and assigned him the task of

"review[ing] and monitor[ing] the transactions and relationships between (i) the Debtor and (ii) Holdings and its other subsidiaries (collectively, the "Intercompany Matters"), identify[ing] and address[ing] potential conflicts of interest in relation to the Intercompany Matters, request[ing] and review[ing] reports from management regarding the Intercompany Matters, and represent[ing] and negotiat[ing] on behalf of the Debtor with respect to any resolution regarding the Intercompany Matters." *Motion,* at ¶ 23. After performing an independent investigation with the assistance of his independent legal counsel, Katten Muchin Rosenman, LLP ("Katten"), Mr. Pickering identified several potential claims against Holdings and the affiliates that he believed were not viable, but also identified viable claims for amounts due to the Debtor pursuant to: (i) an Intercompany Note due from Holdings, (ii) a net balance owed from Holdings as a result of the centralized cash management system, and (iii) certain aged accounts receivable owed by Worldwide (the "Outstanding RTV Obligations"). The Outstanding RTV Obligations served as the basis for negotiating the Global Settlement.

Upon commencing this case on February 16, 2026, the Debtor, through Mr. Pickering, immediately filed this Motion along with the DIP Financing Motion[7] and the Sale Motion.[8] Those motions, with the Settlement Motion, comprise the infamous "three legged stool" that the Debtor has argued is crucial to successfully navigate its chapter 11 case. Approval of this Motion allows

---

[7] *Motion Pursuant to Sections 105, 362, 363, 503, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rules 2002-1, 4001-2 and 9013-1 for Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* (the "DIP Financing Motion" at Doc. 17).
[8] *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtor's Assets, (B) Authorizing the Debtor to Enter Into the Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtor's Assets Free and Clear Of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (the "Sale Motion" at Doc. 16).

the Debtor to obtain the Settlement Assets from the affiliates in satisfaction of the Outstanding RTV Obligations.  Those assets will then be pledged as security for the final DIP loan[9] and included in the proposed section 363 sale. Both the DIP Motion and the Sale Motion are still pending before the Court.

### a.  The Hearing

At the Hearing, the Court first heard testimony from Eric Mendelsohn, a Managing Director and Co-Head of North American Financing Advisory and Restructuring at Greenhill & Co., LLC, investment banker for the Debtor.  Mr. Mendelsohn testified about the process employed to obtain debtor in possession financing and the marketing of the Debtor's assets.  He testified potential purchasers expressed an interest in buying the assets and but he heard from those parties the "non-debtor assets, are really critical to the operation of the VEEGUM® family of products." *April 16 Transcript*, 24:11–25 and 25:1–12.  He stated Greenhill "receive[d] feedback from potential buyers and lenders that they would like to have those non-debtor assets to be part of the sale of part of the assets on which they would lend money."  *Id.* at  25:17–20.  "Every single [indication of interest] was either verbally or in their letters told us that they wanted those assets." *Id.* at 26:2–3.  Mr. Mendelsohn stated the non-debtor Settlement Assets provide value to the estate and are important to bidders to maximize value.  *Id.* at 26:4–17.

Mr. Pickering was then called to the stand. He discussed his extensive qualifications as a CPA(CA), Chartered Insolvency and Restructuring Professional and a Licensed Insolvency Trustee (Canada).  His experience included senior roles at Ernst & Young LLP, Mesirow Financial

---

[9] Pursuant to the *Order (I) Approving Bidding Procedures for the Sale of Substantially all of the Debtor's Assets, (II) Authorizing the Debtor to Enter Into the Stalking Horse Agreement and To Provide Bidding Protections Thereunder, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (VI) Granting Related Relief* (the "Bid Procedures Order" at Doc. 244).  Commodore Materials, LLC ("Commodore") was designated as the stalking horse purchaser.  An affiliate of Commodore is the lender for the DIP Financing Motion.

Consulting, Inc., KPMG LLP and Deloitte & Touche, LLP.  Mr. Pickering testified that he had never worked with, or had any prior relationship with, the Debtor, Holdings, or other non-debtor affiliates until his engagement as an independent manager.  Mr. Pickering disclosed that he only knew Mr. Vomero through prior work engagements. He confirmed that he was hired to look at intercompany transactions and claims and that the Debtor's Board of Directors did not put any limitations on his investigation nor did they attempt to influence the outcome of it.  *Id.* 34:17–35:4.

Mr. Pickering testified that he undertook an investigation of insider causes of action, explaining in detail the research and steps he took to understand and explore intercompany matters, including the cash management system. He stated that an error in the cash management system led to a discrepancy wherein the Global Netting[10] was completed in order to correct the system flaw and accurately reflect the true amount due from Holdings to the Debtor.  He explained in detail his assumptions and calculations in arriving at the present value due to the Debtor on  the Outstanding RTV Obligations after consultation with Greenhill and Mr. Vomero.  *See generally, id.* at 85:1–92:6.

Mr. Pickering discussed recoveries through litigation, what debts were owing, and potential claims relating to intercompany transactions. He stated he analyzed alter ego, veil piercing, and successor liability claims (collectively, the "Alter Ego Claims"). He repeatedly consulted with Katten and testified regarding his reliance on three presentations Katten prepared for him that detailed the investigation and contained a legal analysis of intercompany claims and defenses that may be raised.[11]  *See December 15, 2025 Presentation, January 27, 2026 Presentation and*

---

[10] The Global Netting transaction was disclosed on the Statement of Financial Affairs. (Doc. 171, pp. 15–16, section 13).

[11] Pursuant to the Court's oral ruling on the UCC's Motion to Compel, Mr. Pickering was directed to either produce unredacted versions of the Presentations, or he would be precluded from offering any testimony at trial that he relied on the legal advice contained therein.

*February 13, 2026 Presentation* (the "Presentations").  After analyzing all of the information, he concluded that $19M to $27M was the range of potential recoveries by the Debtor on the Outstanding RTV Obligations, *April 16 Transcript*, 85:11–15, and the Settlement Assets along with the support services and other consideration going to the Debtor through the Global Settlement was valued at $27.1M.  *Id.* at 92:18–93:24.  Mr. Pickering stated the negotiations resulted in the Debtor having received the "top of the range." *Id.* at 93:20–94:5.  He also concluded that the Global Settlement was "fair and reasonable" because it provides a benefit to the Debtor's creditors that if not approved, would be significantly less given they would not have the benefit of the VEEGUM® assets and the likelihood of litigation and collection risks.  *See id.* at 116:4–117:5.

During cross examination, Mr. Pickering conceded that he did not spend much time analyzing the 2013 Restructuring that led to the creation of the Debtor, Holdings, and other non-debtor affiliates. He also did not analyze or estimate the amount of potential talc liabilities that may come due. The UCC asked him about perceived deficiencies in his investigation that: (i) unlike his other interviews of various company personnel, Mr. Pickering did not take notes during his several meetings with Mr. Vomero; and (ii) he did not directly speak to Randall Johnson, President of Holdings and a former Board Member of the Debtor. The UCC focused on language contained in emails from Mr. Johnson where he stated Holdings "pulls all of the strings" and that the Debtor's board provided a "rubber stamp" for Holdings' decisions, to highlight that Holdings may have exercised domination and control over the Debtor that could lend credence to the Alter Ego Claims.[12]

---

[12] The UCC highlighted an inconsistency between the redacted Presentation and the unredacted Presentation that were produced through discovery; counsel for Mr. Pickering claimed the inconsistency was the result of a law firm clerical error and should not be imputed to Mr. Pickering's credibility.

Michael Wyse, managing partner at Wyse Advisors, LLC then testified as the financial advisor to Holdings and its non-debtor subsidiaries. He agreed with much of Mr. Pickering's testimony about the amounts due between the Debtor and its affiliates and stated he verified the calculations with respect to the Global Netting transaction. Under cross examination, he admitted he was hired in November of 2025, approximately six months after the Global Netting transaction took place.  He also noted that because he was engaged on behalf of Holdings, he did not analyze the value of the settlement for Minerals. *See id.* at 206:9–12.

Michael Atkinson, a partner with Province LLC, testified as the UCC's financial expert with experience in estimating mass tort claim liability. After his detailed analysis, he concluded the liability for future talc litigation claims in the next 30 years was approximately $525M, and therefore the potential 1% payment to claimants under the Global Settlement was not reasonable. *See id.* at 210:6–11. On cross-examination, Mr. Atkinson conceded that he did not have access to much of the data that Mr. Pickering had which could have provided additional information on the value of future talc litigation claims, calling into question his estimated value of $525M. *See id.* 232:12–235:5.

### III.   Legal Analysis

#### a.   *Purdue* End Around

Before the Court reaches the Rule 9019 and *Iridium* factor analysis, it must decide if the proposed settlement releases sought run afoul of *Purdue Pharma,* which prohibits non-consensual releases of claims against non-debtor third parties. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 226 (2024). The UCC and UST allege the Debtor is seeking to release the talc claimants' Alter Ego Claims against the non-debtor affiliates without their consent.  The UCC argues that the Motion "should be rejected to the extent that it seeks to settle and release the tort claimants' state

law claims, rights and remedies against non-debtor parties." *UCC Objection*, at ¶ 132. The Debtor

counters that the Alter Ego Claims are property of the estate that it has authority to settle and

release. This gatekeeping issue must be resolved first, as the remaining arguments would be

rendered moot if the Court were to adopt this "Purdue End Around" argument advanced by the

UCC and the UST.

Recently, the Second Circuit considered the authority of a chapter 11 trustee to recover

assets from the debtor's affiliate using alter ego and veil piercing theories. *HK Int'l Funds Invs.*

*(USA) Ltd., LLC v. Despins* (*In re Kwok*), No. 24-2504, 2026 WL 922975 (2d Cir. Apr. 6, 2026).

The Second Circuit noted: "section 544(a) permits the trustee to assert any generalized claims that

would belong to a hypothetical high-priority lien creditor," and the determination of whether such

a claim belongs to the estate is determined through state law. *Id.* at *4. The Court then reiterated

the test to determine whether a claim belongs to an estate is to distinguish between "personal" and

"general" claims. *Id.* at *5 (citing *In re Nordlicht*, 115 F.4th 90, 105 (2d Cir. 2024)). "If a claim

is a general one, with no particularized injury arising from it, and if that claim could be brought by

any creditor of the debtor, the trustee is the proper person to assert the claim." *Id.* (quoting *St. Paul*

*Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)). And, "[b]y contrast,

creditors – not the trustee – 'are exclusively entitled to pursue personal claims,' which belong only

to specific sets of creditors harmed in particular ways." *Id.* (citation omitted) (also holding that

"trustees may assert generalized alter-ego claims either under section 544 or – if those claims also

belong to the estate itself – under section 541").

The *Kwok* court, citing *In re Nordlicht,* found that "reverse veil-piercing claim[s] [are] . . .

general." *In re Kwok*, 2026 WL 922975 at *5. These reverse veil piercing claims "increas[e] the

basket of assets that could be used to satisfy any and all liabilities owed by the debtor[,]" and "[a]s

10

such, they are general claims that enlarge the size of the bankruptcy estate for all creditors – not particular claims that only certain subsets of creditors could assert." *Id.*  In concluding that veil piercing and alter ego claims are general claims, the *Second Circuit* conclusively established those claims belong to the estate. *Id.* This logic similarly applies to successor liability claims.

Here, the record is clear that any direct claims by talc claimants against the parties to the Global Settlement are not being released. *See*, *e.g.*, *Holdings Reply*, at ¶ 3 ("direct claims held by third party individual plaintiffs are not impacted or released by the Global Settlement"); *id.* at ¶ 18 ("The Global Settlement does not contain any Purdue-type nonconsensual third-party releases. Nor does it contain any releases of direct liability claims against either the Debtor or R.T. Vanderbilt. No party is stripped of any direct claims without its consent.").  In addition, the record demonstrates that direct claims against officers and directors are not being released.  *See Debtor Reply*, at ¶ 7 ("[t]he Settlement does not release any claims— direct or derivative—against the Debtor's directors or officers"); *id.* at ¶ 63 ("[t]he Settlement does not release the Debtor's officers and directors from estate causes of action. To the extent any such individual qualifies as a "Representative" of a released party, any release would run only in that capacity, not in his or her capacity as an officer or director of the Debtor."). Therefore, in the event that talc claimants intend to assert direct claims against Holdings, non-debtor affiliates or directors and officers of the Debtor, those rights are preserved. Thus, the UST and UCC's position that the approval of the settlement would violate *Purdue Pharma* is in error as talc claimant's direct claims are not being released without their consent.

### b. Heightened Standard for Review

Having determined the proposed releases do not violate *Purdue Pharma*, the Court turns to the settlement.  Settling estate claims naturally implicates section 363, which states that "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *Wyse v Fuller* (*In re Voyager Digital Holdings, Inc.*), Nos. 22-10943, 24-01454, 2025 Bankr. LEXIS 1170, at *35 (Bankr. S.D.N.Y. May 12, 2025) ("A debtor cannot dispose of such claims without the approval of the bankruptcy court. 11 U.S.C. § 363(b). A debtor also cannot settle or abandon claims without court approval. 11 U.S.C. § 554; Fed. R. Bankr. P. 6007, 9019").

The standard for determining whether to grant relief under section 363 is whether the debtor exercised sound business judgment. *See In re Giftcraft Ltd.*, 672 B.R. 173, 180 (Bankr. S.D.N.Y. 2025). However, courts have held that transactions that benefit insiders must withstand heightened scrutiny. *See In re Enron Corp.*, 335 B.R. 22, 28 (S.D.N.Y. 2005).

Given the insider transactions at issue, the parties agreed at the Hearing that the standard to be employed is that of heightened scrutiny. Therefore, "some skepticism" must be applied when analyzing whether the Motion should be granted. *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015).

In applying heightened scrutiny, courts analyze the integrity of the transaction and examine "whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). In addition, courts assess "the bona fides of a transaction among a debtor and an insider of the debtor," looking at the "entire fairness" of the transaction at issue. *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020).

### c.   The Settlement

Turning to the merits of the Motion, Federal Rule of Bankruptcy Procedure 9019(a) provides, in relevant part, that "[o]n the trustee's motion and after notice and a hearing, the court

may approve a compromise or settlement." Fed. R. Bankr. P. 9019.

"Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (S.D.N.Y. 2012). As a general rule, "[i]t is not the court's task to determine whether the settlement proposed by the parties is the best possible, or fairest, or most appropriate resolution of the dispute." *O'Connell v. Packles* (*In re Hilsen*), 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009). Instead, it must be fair and equitable. *See In re Comair Ltd.*, 2025 Bankr. LEXIS 2811, at *12–13 (Bankr. S.D.N.Y. 2025).

### d. *Iridium* Factors

In the Second Circuit, the analysis to determine whether a settlement is fair and equitable is dictated by the *Iridium* factors. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007). The *Iridium* factors consider:

> (1) a comparison between the possibility of success and the benefits offered by the settlement;
> (2) the likelihood of complex and protracted litigation in the absence of a settlement;
> (3) the interests of creditors, including "the degree to which creditors either do not object to or affirmatively support the proposed settlement;"
> (4) whether other parties in interest support the settlement;
> (5) the competency and experience of counsel supporting the settlement and the experience of the bankruptcy judge in reviewing the settlement;
> (6) the nature and breadth of the releases to be obtained by officers and directors; and
> (7) the extent to which the settlement is the result of arm's-length bargaining.

*See id.* at 462.

The Debtor argues that all *Iridium* factors are met here. *See Motion*, at ¶¶ 58–73. By contrast, the UST and UCC argue none of the *Iridium* factors are met. *See UST Objection*, at ¶¶ 11–19 and *UCC Objection*, at ¶¶ 236–67. The Court shall analyze each factor in turn.

13

### i. Balancing Litigation Success and Settlement

In balancing the litigation success and settlement factor, the Debtor contends the settlement provides a mechanism to continue operations, consummate a sale and maximize the recovery to creditors such that the benefits from the settlement outweigh the potential for recovery if the claims were litigated. *Motion*, at ¶ 60. The time, cost and uncertainty in prosecuting the claims balanced against the terms of the settlement weigh in favor of the settlement. *Id.* at ¶ 61. The UST argues that the "record does not provide a sufficient basis for the Court to determine whether the consideration being provided exceeds the potential value of the claims being released." *UST Objection*, at ¶ 11. The UCC agrees, noting that "at this stage, due to the significant intertwining of the Debtor and the non-debtor affiliates, the Committee has been unable to perform proper due diligence into these intercompany claims, or determine if there are other, additional intercompany or shareholder transactions that should be investigated that may have similarly high chances of success." *UCC Objection*, at ¶ 238.

The first factor is one of the most important factors to consider. *See In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 272167 at *21 (Bankr. S.D.N.Y. Jan. 28, 2022). The Court need not "hold a mini trial" on the merits of the potential claims. *In re Enron Corp.*, No. 02 CIV. 8489 (AKH), 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003). In fact, courts have held that "[w]hen claims at issue in a settlement raise complex questions of fact and law that are not easily decided, courts find that the first Iridium Factor weighs towards approving a settlement." *In re LATAM Airlines Grp. S.A.*, 2022 WL 272167 at *21; *see In re NII Holdings, Inc.*, 536 B.R. 61, 122 (Bankr. S.D.N.Y. 2015). Nevertheless, a court "should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair

14

assessment." *In re Comair Ltd. (in Liquidation)*, No. 21-10298 (JLG), 2025 WL 3037797, at *4 (Bankr. S.D.N.Y. Oct. 30, 2025) (quoting *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

As the Debtor is a Delaware limited liability company, Delaware state law governs the analysis of the Alter Ego Claims. Delaware law contemplates a veil piercing scenario in "exceptional cases." *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012). The standard is high. "Delaware public policy disfavors disregarding the separate legal existence of business entities." *Paul Elton, LLC v. Rommel Del., LLC*, 2020 WL 2203708, at *14 (Del. Ch. May 7, 2020); *see Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task."). Delaware courts consider a number of factors in determining to pierce the corporate veil: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021).

Here, the Pickering Declaration and Mr. Pickering's testimony detailed the underlying investigation, assumptions and analysis that he used to assess the potential success of litigation on the Alter Ego Claims under Delaware law and on all intercompany claims. The January 27, 2026 Presentation indicated Katten reviewed 1,782 pages of the Debtor's documents relating to the Intercompany Matters from 2013 to present and reviewed 4,743 pages plus 340 excel spreadsheets from Holdings and its subsidiaries in response to various due diligence requests. *January 27, 2026 Presentation*, pp. 7–8. After that extensive review, Mr. Pickering identified six related party

15

transactions that he investigated, and repeatedly testified that he did not believe there were "viable and valuable" causes of action with respect to three of those transactions, including the Alter Ego Claims. He discussed Delaware's high standard that "total dominance and control" over the Debtor must be demonstrated to be successful on any such claims. Mr. Pickering testified about the separateness of the Debtor from the non-debtor affiliates including operations, location and corporate governance. He noted the corporate structure and cash management systems in place here were common with these types of companies. He therefore determined the Alter Ego Claims were not worth pursuing.

After concluding the Outstanding RTV Obligations remained as the only viable claims, Mr. Pickering provided an in depth assessment of the possibility of success along with the risks of litigation, and the time and expenses involved. He discussed his rationale for settling those claims. He testified that the Intercompany Note was not in default and did not mature until 2037, so the Debtor lacked legal grounds to bring a cause of action to recover on that debt. *April 16 Transcript*, 62:18–63:13. He detailed his assumptions and methodology for discounting the accounts receivable because of the risk of litigation and accumulating attorneys' fees. *Id.* at 79:6–85:19. He also reviewed the financial statements of the potential insider defendants to properly consider the collectability of any judgment. *Id.* at 107:6–113:18. He reviewed the value of the Settlement Assets and support services being provided to the Debtor in satisfaction of the RTV Obligations, and concluded the consideration being paid was at the high end of his expected recovery. *Id.* at 85:1–92:6. As a result, he concluded the Global Settlement's benefits outweighed any possibility of success in litigation.

The UCC repeatedly questioned why Mr. Pickering did not even attempt to make a specific settlement demand on the Alter Ego Claims. He testified that since they were not valid and viable,

16

he did not make any such demand. *Id.* at 164:25–165:16, 171:22–172:4. Mr. Pickering  was also asked why he would consider collectability of a claim before a lawsuit was even commenced, as that was allegedly not common practice.  He believed that the ultimate recovery in litigation was a valid consideration when assessing whether to settle or pursue any claims.  *Id.* at 107:15–111:9.

In light of Mr. Pickering's thorough analysis and credible testimony, this factor weighs in favor of approval of the settlement.

### ii.   Likelihood of Protracted Litigation

As to the second factor, the Debtor contends that "avoiding costly litigation that would unnecessarily waste resources is in the best interests of the estate." *Motion*, at ¶ 63. Further, the benefits and certainty derived from the Global Settlement outweighs the potential limited recovery in the event litigation is successful. *Id.* at 65.

The UST repeats the argument that the Debtor is relying on speculative and generalized assertions. *See UST Objection*, at ¶ 12.  The UCC also argues the record is too devoid for the Court to make a ruling as to this factor.  *See UCC Objection*, at ¶ 242.

Courts have found that if a settlement addresses "not only current litigation but also anticipated litigation as well," that this factor would weigh in support of said settlement as it mitigates "legal uncertainty and legal expenses" that would likely "contribute to greater creditor recovery." *In re Wythe Berry Fee Owner LLC*, 660 B.R. 534, 565 (Bankr. S.D.N.Y. 2024).

The record reflects that protracted litigation is highly likely if the Global Settlement is not approved.  In Holdings' Reply in support of the Motion, they not surprisingly raised several of the defenses that Mr. Pickering considered and stated they would vigorously defend against any actions brought by the Debtor.  *See, e.g.*, *Holdings Reply*, at ¶ 23. While the litigation may not be complex, there are sufficient unsettled issues to drag it out, and the likelihood of significant

17

additional recovery is limited. As a result, this factor also weighs in favor of settlement approval.

### iii. Interests of Creditors

As to the interests of creditors factor, the Debtor asserts it has liquidity constraints that could be amplified if the Motion is not granted. This in turn could reduce any recovery by creditors. *Motion*, at ¶ 68.

The UST argues that the Global Settlement "extinguishes claims against affiliates and restructures intercompany obligations without a clear showing that creditors are receiving commensurate values," and that "the primary stakeholders in this case, the tort claimants, through the UCC, oppose the Settlement Agreement and seek dismissal of this case." *UST Objection*, at ¶¶ 13–14. Similarly, the UCC strenuously objects to the Motion, arguing the *de minimis* compensation to claimants, if approved, and the foreclosure of potential rights that claimants possess violates the Debtor's fiduciary duty to maximize value for the benefit of creditors. *See UCC Objection*, at ¶¶ 247–49. In light of the talc creditors' vehement objection to the proposed settlement through the UCC, as well as statements made at the Hearing by talc claimants' counsel, this factor strongly weighs in favor of denying the Motion.

### iv. Support of Parties in Interest

As to the fourth factor, the Debtor relies on the RTV parties' contributions as support for the settlement. *Motion*, at ¶ 69. The Court notes the support of the DIP Lender as well, but it discounts that support since both DIP Lender and the RTV parties are direct beneficiaries of the settlement.

While the talc claimants are the largest and arguably the most important parties in interest, the Court cannot overlook the Debtor's employees and their communities. Even if a sale is not approved, the Global Settlement allows the Debtor to acquire assets that are critical to its viability

18

as a going concern, continuing to provide 125 jobs at various locations throughout the country. Other parties in interest who benefit include customers, trade vendors, and the ultimate commercial and individual end users of the VEEGUM® products. Thus, this factor overall weighs in favor of approval of the settlement.

### v.  The Competency and Experience of Counsel

The Debtor argues the competency and experience of counsel involved weigh in favor of approval as each of the settlement parties had independent counsel who extensively negotiated in good faith.

The UST questions the disinterestedness of the independent counsel and whether the Settlement Agreement was indeed negotiated in good faith." *UST Objection*, at ¶ 15. The UCC makes the same argument, but also asserts that "the Debtor's board limited the scope of the investigation that Mr. Pickering and Katten undertook to intercompany matters." *See UCC Objection*, at ¶¶ 256–58.

At this juncture, Jones Day is no longer involved.[13] The testimony showed Mr. Pickering had no prior relationship with the Debtor or its affiliates. Moreover, although the UCC alleged otherwise, Mr. Pickering stated his investigation was not limited in any manner, and Katten, an international full-service law firm, was the sole provider of legal advice in reaching the agreement. Holdings and the other parties to the Global Settlement were likewise represented by experienced, competent counsel at Vinson & Elkins LLP.

As a result, the competency and experience of counsel involved weigh in favor of granting the Motion.

---

[13] The Court previously denied approval of Jones Day's retention as counsel for the Debtor.

19

### vi.   Nature and Breadth of the Releases

As to the sixth factor, the Debtor asserts "[t]he releases are being given in exchange for substantial value and provide finality to all disputes between and among the Settlement Parties." *Motion*, at ¶ 71.

The UST argues that the "the nature and breadth of the releases being offered by the Debtor are in violation of the Bankruptcy Code and applicable law." *UST Objection*, at ¶ 16. The UCC notes that the officers and directors have contributed nothing in return for the releases they are receiving. *UCC Objection*, at ¶¶ 260–63.

This factor weighs in favor of denying approval of the settlement.  While the Court concluded the Debtor's proposed releases did not violate *Purdue Pharma* because the Alter Ego Claims are generalized claims that belong to the estate, the broad release of those claims forecloses any future investigation and potential recovery from Holdings and the affiliates on the insider transactions and any other matters that may not yet be known.  As the UCC correctly pointed out, it had only six weeks to investigate insider claims that Mr. Pickering reviewed for five months, effectively tying one arm behind the UCC's back in this fight. In addition, while the disclosure of information to the UCC was ongoing and generally uncontested, the UCC did not receive the three unredacted Presentations that Katten prepared for Mr. Pickering until the UCC brought a motion to compel, and only days before the Hearing. Without sufficient time for a thorough investigation by the UCC, there is a persuasive argument that the broad releases should not be approved.

This factor is troubling.  Releasing known and potential unknown causes of action against Holdings and the affiliates under such a tight time frame is problematic.  However, the UCC had two large teams of very experienced and capable counsel who spent a tremendous amount of time and resources to review the transactions at issue.  Although the UCC and UST made strenuous

20

arguments that the settlement and releases were the result of Mr. Pickering's "sham" investigation, no evidence or testimony presented by the UCC or UST supported that position. Mr. Pickering fully investigated the potential claims being released and believed the releases were appropriate. Moreover, the officers and directors are not being released, nor are any direct claims. The affiliates or their parent companies being released are contributing assets with significant value to the Debtor and agreeing to provide ongoing operational support to allow the Debtor to continue in business (or be sold) as a standalone operation. The record is clear the Debtor's affiliates would not agree to the settlement without the broad releases being provided. These considerations mitigate the Court's concerns about the nature and breadth of the releases, and the Court concludes they are necessary and appropriate under the circumstances.

### vii.  Extent of Arms' Length Bargaining

As to the final *Iridium* factor, the Debtor relies on the active involvement of each settling parties' independent counsel as support for the claim the Settlement Agreement was negotiated at arms' length and in good faith. *Motion*, at ¶ 72.

The UST argues that "the record calls into question whether the settlement reflects a truly independent negotiation." *UST Objection*, at ¶ 17. The UCC agrees. *See* UCC Objection, at ¶¶ 264–67. As noted above, the UCC also highlighted the deficiencies that allegedly imply Mr. Pickering lacks independence, including the failure to follow up on the emails wherein Mr. Johnson states that "Holding pulls all the strings," and that "[Debtor's] board essentially provided a 'rubber stamp" and his failure to take notes during his meetings with Mr. Vomero. These shortcomings, the UCC argue, are further evidence of Mr. Pickering's investigation being a "sham."

21

In spite of the UST and UCC's inferences, the record demonstrates the Global Settlement was the result of arms' length bargaining by Mr. Pickering and his counsel on one side, and Holdings, the affiliates and their counsel on the other. Mr. Pickering testified he or his counsel made settlement demands and attended a full day settlement conference at the Katten offices in February. *See Pickering Declaration* at ¶ 13. The Timeline of events showed seven term sheets and multiple offers exchanged before an ultimate deal was reached, reflecting robust negotiations took place. *See Special Committee Exhibit* 8. This evidence persuades the Court to find the bargaining was done in good faith at arms' length.

This factor weighs in support of approval of the Motion as "the proposed settlement was the result of a vigorously negotiated process." *In re Adelphia Communs. Corp.*, 368 B.R. 140, 246 (Bankr. S.D.N.Y. 2007). Courts have also found this factor to weigh in favor when "multiple parties gave concessions, and agreement ultimately was reached by parties with distinct fiduciary obligations." *In re NII Holdings, Inc.*, 536 B.R. 61, 120 (Bankr. S.D.N.Y. 2015). Such is the case with Mr. Pickering here.

### viii.  Other Factors

The UCC notes that another factor Courts consider is whether the proposed settlement falls above the "lowest point in the range of reasonableness." *See In re DiStefano*, 654 B.R. 49, 54 (Bankr. N.D.N.Y. 2023) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 613 (2d Cir. 1983)). The UCC points to the fact that (a) the claims being resolved may exceed the amount being paid under the Global Settlement; and (b) there is a failure by the Debtor to include sufficient information for the Court to value such claims and assess whether non-debtor affiliates can be held liable for such claims. *See UCC Objection*, at ¶¶ 268–89. The UST similarly argued at the Hearing that the Court has no ability to assess the value of the claims being released based on the record before it.

22

The Court disagrees. The Court found Mr. Pickering to be a qualified, experienced, credible witness. He assessed the intercompany claims, used commercially reasonable assumptions, analyzed the potential for recovery under multiple legal theories, and quantified the viable and valuable claims. He believed the consideration the Debtor was receiving was at the high end of the range of potential recovery at over $27M. His investigation and consultations with Katten, detailed in the Presentations, were thorough and appropriate. Mr. Pickering did not have any ties or loyalties to the Debtor's board and management, nor to its affiliates or their professionals. He stated unequivocally he was a fiduciary for the Debtor and built in a "fiduciary out" in the Settlement Agreement if additional information came to light that would cause him to reconsider it. In person and through counsel, he negotiated a settlement that he believed was in the best interests of the estate.

### e.  *Sub Rosa* Allegations

The UST finally argues that the Global Settlement is a *sub rosa* plan that is an attempt to circumvent the Bankruptcy Code. *See UST Objection*, at ¶ 22.

The UST cites to *In re Genesis Glob. Holdco, LLC* and its factors in arguing that (a) the Global Settlement dictates the Debtor's reorganization; (b) the Global Settlement bypasses voting rights of creditor; (c) the proposed sale process disposes large assets belonging to the Debtor; and (d) approval of the Global Settlement would effectively force the creditors to waive claims against the Debtor and its affiliates. *See UST Objection*, at ¶ 24 (citing *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439).

At the Hearing, the Debtor[14] disputed that the Global Settlement is a *sub rosa* plan, as even if the Motion and subsequent Sale Motion are granted, there are still a large number of insurance

---

[14] This argument was advance by Bond Schoeneck & King, PLLC, co-counsel for the Debtor, and not Mr. Pickering.

policies[15] that would remain in the estate, in addition to the proceeds from the sale of the Settlement

Assets. The Court agrees with this position.

The Global Settlement does not dictate the Debtor's reorganization or liquidation, and it

appears there are other material assets such as insurance policies that may further enhance the

estate.  The transaction brings assets into the estate that allow the Debtor to operate as a stand-

alone business or be sold as a going concern. The creditors have not waived any claims against the

Debtor, and the Alter Ego Claims against its affiliates do not belong to them. Finally, the creditors

will have the right to vote when a plan is ultimately proposed.

### f.   Other Considerations

The Court is very sympathetic to the 1,400 talc claimants in this case and their families,

many of whom have been suffering and seeking their day in court for justice for years. The loss of

the ability to sue the Debtor as a result of this bankruptcy and to pursue the Alter Ego Claims

against the affiliates is an extremely difficult situation.  This reality is not lost on the Court and the

creditor's opposition weighed heavily against approving the Global Settlement.  However, the

Bankruptcy Code, Rules and Second Circuit precedent dictate the process and analysis for the

settlement of claims, and the Court must adhere to them.  While the claimants did not ask to be

here, the bankruptcy forum is designed to orderly liquidate and monetize the Debtor's assets,

prevent a race to the courthouse, and provide a fair and equitable process for distribution on those

claims.  As noted by the Debtor, there are a significant number of insurance policies which may

be additional sources of recovery.  While there is no amount of money that can ever compensate

the talc claimants for their injuries and loss of life - much less make the claimants whole - the

---

[15] See Schedule A/B, section 73 listing over 150 polices covering time periods from 1956 to 1986, the value of which is unknown.

Court believes this orderly process will provide the best chance of recovery for all claimants, not only those currently at the courthouse steps.

## IV. Conclusion

As a result of the foregoing, after applying heightened scrutiny to the Global Settlement and balancing the *Iridium* factors, the Court finds the factors weigh in favor of granting the Motion. Counsel for Mr. Pickering is directed to submit an order specifying the Debtor Released Claims (as defined in the Settlement Agreement) shall not include any claims against the Debtor's directors and/or officers in their capacity as such, notwithstanding that such directors and/or officers may be Vanderbilt Entities Released Parties (as defined in the Settlement Agreement) in any other capacity; or any direct claims held by any creditor, as directed in the Court's oral ruling.

###